Bessie Mae DAVIS, et al., Plaintiffs,

v.

The MANSARDS, et al., Defendants.

Civ. No. H 82–438.

United States District Court,
N.D. Indiana,
Hammond Division.

Nov. 14, 1984.

Ruth M. Hennage, Portage, Ind., F. Willis Caruso, Elizabeth Shuman Moore, Chicago, Ill., for plaintiffs.

Patrick J. Galvin, Hammond, Ind., Albert C. Hand, Highland, Ind., for defendants.

## ORDER

MOODY, District Judge.

On Tuesday, June 5, 1984, a four-day bench trial commenced in this court, brought by plaintiffs Bessie Mae Davis, Wesley Davis, Jr., the Northwest Indiana Open Housing Center, Glindolyn Johnson and Cecil Johnson against defendants The Mansards, Inc., James R. Lauerman, Patrice Burke, and Phyllis Reznik Miklusak.

The plaintiffs alleged violations of The Civil Rights Act of 1866, 42 U.S.C. § 1982, and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* Both plaintiffs and defendants were represented by counsel. Following presentation of evidence by the parties, the Court took the matter under advisement. After consideration, the Court now directs the Clerk of the Court to enter judgment for the plaintiffs. The Findings of Fact and Conclusions of Law are as follows.

## FINDINGS OF FACT

1. The Plaintiffs Bessie Mae Davis and Wesley Davis, Jr. and Glindolyn Johnson and Cecil Johnson are black citizens of the United States who reside in Lake County, Indiana.

2. Plaintiff Northwest Indiana Open Housing Center is a not-for-profit corporation organized under the laws of Indiana and supported by private contributions, foundation grants and contracts with the cities of Gary, Hammond and East Chicago and the Office of the Calumet Township Trustee. The purpose of the organization is to further the goals of the Fair Housing Act and to promote equal opportunity in housing in Northwest Indiana.

3. At the time they submitted an initial application to the Mansards, on March 5, 1981, Wesley Davis and Bessie Mae Davis were 49 and 50 years old, respectively, and had four adult children. Mr. Davis had been employed by U.S. Steel for 32 years and held a management position. Mrs. Davis was a homemaker.

4. The Davises owned a residence at 2116 Whitcomb, Gary, Indiana. They had lived at that address approximately twenty-five years.

5. At the time of their inquiry at the Mansards on April 13, 1982, Cecil and Glindolyn Johnson were 46 and 45 years old, respectively, and had four children ages 14 through 21. Mr. Johnson had worked at U.S. Steel for 27 years and at the time of the inquiry was an electrician. Glindolyn Johnson had been employed at the Northwest Indiana Open Housing Center since September, 1979, as office manager and bookkeeper.

6. The Johnsons owned a residence at 6940 East First Avenue, Gary, Indiana.

7. Defendant, The Mansards, Inc. is an Indiana Corporation licensed to engage in real estate construction, management and ownership of rental units. The corporation manages The Mansards apartment complex in Griffith, Indiana.

8. At the times relevant to the complaint, defendant James R. Lauerman was a white resident of Lake County, Indiana. Mr. Lauerman held a Real Estate License from the State of Indiana. He was the General Manager of The Mansards, Inc. and maintained an office in The Mansards apartment complex. Among his other duties, he determined if a credit check was necessary to the approval of a given applicant.

9. Defendants Phyllis Reznik Miklusak and Patrice Burke were white residents of Lake County, Indiana. They both held Real Estate licenses from the State of Indiana and both were employed as full-time rental agents at The Mansards.

10. Both Miklusak and Burke received a base salary and an additional commission for apartments rented. That commission did not vary with the race of the apartment renters. An extra bonus commission would occasionally be added to the regular commission for particular apartment units as additional incentive to rent units which were perceived as "slow-moving." Mr. Lauerman decided which apartments received this treatment.

11. The Mansards apartment complex has 1,337 rental units. In 1982, the complex had the following units and rental ranges:

| 456 One-bedroom | $330.00—$415.00/mo. |
| 180 Two-bedroom | $365.00—$799.00/mo. |
| 101 Three-bedroom | $547.00—$574.00/mo. |

12. The Mansards, Inc. manages an additional 100 units located at Wood Street and Glenview in Griffith, Indiana.

13. The current officers and only Board Members of The Mansards, Inc., are James W. Dye, President; John P. Bullard, Vice-President; Patrick J. Galvin, Secretary; and Marilyn A. Rodda, Treasurer. These persons held the same offices and were the only Board Members in 1981 and 1982. The current stockholders of the corporation are James W. Dye, approximately .78%; John P. Bullard, approximately .21%; Joan Patini, .61%; and James R. Dye, .05%.

14. The Mansards primarily advertise in The Times, a Hammond, Indiana newspaper. They also advertise on WJOB, a Hammond radio station, and WCAE-TV out of St. John. In 1982 and 1983, ads appeared in the Chicago Tribune and Sun Times. A 1983 ad campaign targeted Illinois communities. The Mansards did not advertise in the Gary Post-Tribune during the years 1980–1983. The advertising expenditures for the years 1980–1983, excluding telephone directory were: 1980: $16,610.51; 1981: $31,866.41; 1982: $47,241.64; 1983: $44,311.71.

15. As a part of their promotional activities, The Mansards distributes a glossy brochure which states that the complex combines "old world elegance and luxuries with the practical benefits of a modern apartment home. Nothing like this has existed before in this part of the United States." The brochure describes The Mansards as Northwest Indiana's first and finest luxury apartments. It also indicates easy access from The Mansards to the I-80 expressway. Plaintiff's Exh. # 13.

16. On March 15, 1981, Wesley and Bessie Davis applied for a unit at The Mansards and paid a $50.00 fee for deposit and handling. The Davises spoke with Rental Agent Phyllis Miklusak on this occasion and she took down the information for their application. Miklusak also gave them keys and directed them to the rental models, which they viewed without the Rental Agent.

17. The application submitted by Mr. and Mrs. Davis indicates under "Remarks" that they requested a Model # 12, two bedroom on the North side, with an occupancy date of May 1, 1981 or April 15, 1981. Plaintiff's exh. 1. The Davises received a receipt number 10587 from The Mansards, Inc., which noted "two bedroom—May 1, open." Plaintiff's exh. 2.

18. "Open" means that the unit was requested for some date in the future and that no unit was assigned.

19. Mr. and Mrs. Davis advised Rental Agent Phyllis Miklusak that they intended to sell their home, but that if the house was not sold at the time an apartment was available their son would rent the house from them. The Davises spoke very briefly with their son regarding this possibility. They were not overly concerned about working out the detailed arrangements in advance because the sale of the Davises' home was not a contingency to renting a unit at The Mansards complex.

20. At the time of their application on March 15, Miklusak told the Davises that no units were available for rent. She told them that their names would be placed on a waiting list. There was no actual waiting list at The Mansards, but the rental agents used the term to refer to the open applications on file.

21. On or about March 15, 1981, there were approximately twenty (20) unit # 12s vacant on the North side of The Mansards complex. No records indicate how many or which of these units were ready for occupancy. Units would often remain vacant for a few days or a few weeks while cleaning and repairs were completed to ready the units for the next occupants. On average, the Renovation Department would need five days to take care of an apartment in between rentals. Transcript, June 8, 1984, at p. 122.

22. On March 19, 1981, James R. Lauerman, General Manager, confirmed in writing that the Davises' application was approved and that The Mansards did not have any North-side Model # 12s available. The letter stated that

[A] Mansard representative will contact you at least thirty days prior to your desired occupancy date with regard to

the availability of apartments. In the interim, we will hold your application in our files with the hopes of filling your apartment needs as soon as possible. Plaintiff's Exh. 4.

23. This was a form letter regularly sent out to approved Mansards applicants. The Davises had no further contact with The Mansards until they received another form letter from Mr. Lauerman, dated February 16, 1982. The text of that read, in full:

In checking our files, we noticed that you have had an application on file since last March. Since we have not heard from you since then, we are refunding your application fee and closing your file. If you are still interested in keeping your application active, you may contact us at your convenience.. Thank you for considering the Mansards as a future home.

Plaintiff's Exh. 5.

24. Enclosed with the letter was a check # 2314 for $50.00 drawn on the "Mansards North Rental Account," dated February 24, 1982. Plaintiff's Exh. 6.

25. After receipt of the check and letter, Mrs. Davis contacted the Northwest Indiana Open Housing Center.

26. On March 2, 1982, Mr. Davis returned the check with a letter stating that he and his wife were still interested in renting at the Mansards.

27. On March 4 or 5, 1982, a white tester acting on behalf of the Northwest Indiana Open Housing Center, Marianne Anderson, went to The Mansards. Ms. Anderson is a professional psychologist in Gary, Indiana. Her training as a tester consisted of one or more individual sessions with Janet Dermody, the investigator at the Northwest Indiana Open Housing Center.

28. Ms. Anderson presented herself to Rental Agent Burke as a single woman. She inquired as to the availability of two bedroom apartments, indicating that she had a good offer to buy the house where she resided, and that she wished to move in to The Mansards as soon as feasible.

29. Pat Burke accompanied Ms. Anderson as she looked at rental models. Anderson did not fill out an application. Burke requested that Anderson call back in two weeks, at which time Burke would know if any apartments were available.

30. Anderson did not complete a written audit report, but gave an oral report to Janet Dermody following her visit.

31. On March 5, 1982, Mrs. Davis called The Mansards office and confirmed that the check and letter had been received. On March 8, 1982, Rental Agent Miklusak called Mrs. Davis. Miksulak indicated that there were still no apartments available, but that perhaps if the Davises came in they could work something out.

32. On March 9, 1982, Mr. and Mrs. Davis went to the complex and spoke with Miklusak. Miklusak would not tell the Davises where they were on the waiting list and indicated that, in practice, she did not always follow the waiting list. Mrs. Davis expressed some displeasure upon hearing of this procedure. The Davises reminded Miklusak that sale of their home was not a contingency to renting at the Mansards. Before leaving, Miklusak gave the Davises one of her business cards.

33. On March 9, 1982, James Lauerman sent the Davises a letter asking that they contact Rental Agent Miklusak and arrange to see "what we have available or will have available in the near future." Plaintiff's exh. 8. The Davises received this letter after their March 9 visit to The Mansards.

34. On March 11, 1982, Ardell Hanley, a black tester, presented herself at The Mansards and requested an apartment for immediate occupancy. Hanley met with a Rental Agent and indicated that her current home would be given to her newly-married son. She was told that no two or one-bedroom units were available and that her husband needed to be present to fill out the application. The Rental Agent did not accompany Hanley as she viewed the model units.

35. Hanley did not complete a written audit report following her visit to The Mansards. She delivered an oral report to Janet Dermody a few hours after her test.

36. On March 11, 1982, The Mansards had approximately 79 two and one-bedroom units vacant.

37. On or about March 13, 1982, Miklusak called Mrs. Davis and told her that a two bedroom was available for viewing because someone's credit had fallen through.

38. A few days later, Mrs. Davis and her adult son Derrick went to The Mansards. They met with Miklusak who gave them the keys to the available apartment, unit 2E of 7S, a large two bedroom model # 11 on the south side. Mrs. Davis and her son viewed the apartment, returned to Miklusak's office and told her that the unit was unsatisfactory—that the Davises had requested a unit 12 on the north side. Mrs. Davis also mistakenly believed that the unit # 11 was smaller than the unit # 12 she had requested. Mrs. Davis was upset that Miklusak had not yet offered the Davises an apartment of the type they had requested, and she and Derrick left The Mansards office.

39. On March 13, 1982, unit 2E of 7S had been vacant for 7 months. The routine records of cancellations and rejections kept by The Mansards do not indicate that someone cancelled on 2E of 7S during the week in question. During that week in March, The Mansards had 11 unit # 12s vacant on the north side.

40. As arranged, tester Marianne Anderson called Burke on or about March 19, 1982. At that time, Burke indicated that an apartment was available. Anderson testified that she did not recall the particular model number. No definite plans were made, and Anderson eventually informed Burke that the house deal had fallen through and that she was no longer looking for an apartment.

41. Janet Dermody discussed the Hanley and Anderson tests with Maurice McGough, Executive Director of the Northwest Indiana Open Housing Center.

McGough, the Center staff, and their attorneys determined that the Hanley and Anderson results were "not sufficient." Transcript, June 5, 1984, at page 214. Their primary weaknesses from the Center's standpoint were (1) the time lapse between the Davises' visit and the testers' visits; and (2) the absence of a written audit form completed by each tester.

42. On April 8, 1982, Jeanne Shiras, white tester, visited The Mansards north office. Shiras was trained as a tester by the Open Housing Center. She looked at a model unit and spoke with Rental Agent Burke. Shiras told Burke that she and her husband had an offer to purchase their house and that, prior to making a commitment to sell, they wished to survey the apartment market in the area. Shiras specifically indicated her interest in a two bedroom, one bath apartment with a balcony, available in early summer, 1982. Burke informed Shiras that it would be very easy for the Shirases to get such an apartment at The Mansards, given thirty days notice. Shiras left, telling Burke that she would bring her husband to view the apartments at a later date. She delivered an oral report to Dermody later that afternoon.

43. On April 13, 1982, at 5:02 p.m., Cecil and Glindolyn Johnson, as black testers, presented themselves at The Mansards north office. After waiting in reception area for a few minutes, the Johnsons met Rental Agent Burke. Burke gave the Johnsons keys to the model units, which they viewed without the agent. When the Johnsons returned to Burke's office, they indicated an interest in a two-bedroom apartment or whatever was available at the moment. Burke told the Johnsons that nothing was available. The Rental Agent asked about the Johnsons' employment and family situation, and was told that Mr. and Mrs. Johnson were both employed and had four children. When Burke asked when the Johnsons wished to move, Cecil replied "about June" and Glindolyn added that "[w]e will take it any time." Transcript, June 6, 1984 at page 35. Burke reiterated that nothing was available. Burke suggested that the Johnsons look elsewhere

and think it over before placing a $50.00 deposit at The Mansards because the waiting list was long and few residents were moving.

44. The Johnsons left The Mansards and went to Mrs. Johnson's office at the Open Housing Center where they completed written audit reports of their test. Plaintiff's Exh. 9, 10.

45. The Mansards' business records indicate that on or about April 13, 1982, The Mansards had approximately seventy-seven (77) two bedroom units vacant.

46. On April 13, 1982, at 5:30 p.m., tester Jeanne Shiras returned to The Mansards with her husband, Don. They went to the north office and spoke with Pat Burke. Mr. Shiras represented himself as a shipper. Burke gave them the keys to some model units which they viewed unaccompanied by the Rental Agent. When they returned to the office, Burke told the Shirases that they could have their choice of two bedroom units and their choice of location; the timing of their move would not affect apartment availability. Though Burke acknowledged that there was a waiting list, she implied that the Shirases could move to the head of the list. The Shirases made their application and paid the $50.00 fee. Burke put them down for a northwest unit # 12 in June. In the margins of their application, Burke wrote "excellent couple" and "A +." Plaintiff's exh. 11.

47. The Shirases left the Mansards and immediately filled out their written audit reports for the Housing Center. Plaintiff's exh. 14, 15.

48. No credit check was done on the Shirases' application. They were sent a form letter of approval and congratulations dated the day after their visit, April 14, 1982.

49. Mrs. Burke contacted the Shirases by phone on two subsequent occasions in the early summer, 1982, to discuss their plans to move to The Mansards.

50. On the evening of July 6, 1981, Dr. Edwin Moore, a black physician, presented himself at The Mansards North Office with a friend, Dr. Michael Linton. The two had phoned ahead immediately before, and were told that an apartment was available. When they arrived at The Mansards and identified themselves as the callers, Rental Agent Resnik informed them a young couple had just rented the particular apartment.

51. Drs. Linton and Moore looked at a model unit. Each of them filled out an application and paid the $50.00 deposit. Dr. Moore specified that he preferred a three bedroom apartment but would accept a two bedroom. Moore requested an apartment as soon as possible; his application reflects this request. Resnik informed both doctors that nothing was available at that time. The Rental Agent wrote an "A" grade on both applications. A credit check was not run on either application.

52. On July 10, 1981, Carolyn McCrady, a white tester using the name Anita Black went to The Mansards. McCrady requested a three bedroom apartment for herself and her young daughter, starting August 1. She viewed two vacant apartments, filled out an application and paid half of the $50.00 deposit. On the receipt which McCrady received, the Rental Agent wrote "G17NE" or "L21NW." Plaintiff's exh. 26. McCrady testified that those are the numbers of the apartments which the Rental Agent told her were available and which McCrady viewed on July 10. No credit check was done on McCrady's application. The Mansards traffic sheet for that week indicates that G17NE was assigned to Anita Black.

53. A few days later, McCrady received a phone message that she had been bumped back to third on the waiting list.

54. On July 20, 1981, Dr. Linton and Dr. Moore filed a discrimination suit against The Mansards.

55. On July 21, 1981 Lauerman sent Dr. Moore a letter stating that his application had been approved, but that The Mansards did not have the type of apartment requested. The letter stated that renting to the doctor was further complicated by the fact

that Moore had children and had to live on the ground floor. Plaintiff's exh. 23.

56. On July 22, 1981 Lauerman sent Dr. Moore a letter indicating that a unit would likely become available in mid-August. Plaintiff's exh. 24. A notation on Moore's application indicates that apartment G17NE, one of the two units viewed by McCrady on July 10, was assigned to Dr. Moore. Plaintiff's exh. 21.

57. Dr. Linton received a similar series of letters from Lauerman. Plaintiff's exh. 19, 20. A notation on Linton's open application indicates that apartment L21NW, the other unit viewed by McCrady on July 10, was assigned to Dr. Linton. Plaintiff's exh. 17.

58. During the week that Linton and Moore applied to The Mansards, the complex had 77 vacant two-bedroom units.

59. On October 20, 1982, white testers Debbie Cochran and David Seddlemeyer went to The Mansards and requested a two-bedroom ground floor unit. They presented themselves as a married couple expecting a child. Rental Agent Miklusak informed them that The Mansards had several units available for occupancy. The testers viewed two model units unaccompanied by the Rental Agent. Miklusak then drove them to another part of The Mansards complex to view a vacant two-bedroom unit. The testers and Miklusak returned to the rental office, where the testers completed an application and made a $50.00 deposit. Miklusak told Seddlemeyer and Cochran that an apartment would be available for them around November 15, 1982. The receipt received by the testers on that day, October 20, indicates that Miklusak had assigned them unit A8S. Plaintiff's exh. 28. No credit check was run prior to this assignment.

60. Both Seddlemeyer and Cochran subsequently completed separate written audit reports for the Housing Center. Plaintiff's exh. 29, 30.

61. On October 21, 1982, Bernadette Jones and Delores Brisco, as black testers, went to The Mansards. Jones requested a one or two bedroom unit. The testers met with Rental Agent Richard Striko. Jones and Brisco viewed a two-bedroom model unaccompanied by Striko. When the testers returned, Jones indicated that she wished to rent an apartment in The Mansards beginning in November. Striko seemed nervous and made no definite arrangements with Jones. He asked that she call back a few hours later when he would know if anything was available on the north side.

62. Jones immediately went to the Housing Center and completed a written report of her audit. Plaintiff's exh. 31. Brisco also completed a report. Plaintiff's exh. 32.

63. Shortly after 6:00 p.m., Jones called Striko and was told to come to the office on the next day, fill out an open application, deposit $50.00, and that if her credit check went through they would speak about apartments. This was her last contact with The Mansards.

64. Both Jones and Brisco noted that Striko seemed to suspect that they were testers.

65. At the time of the testers' visit in October, 1982, Striko was undergoing chemotherapy. He worked an erratic schedule at The Mansards and the management had taken care to structure his work environment.

66. Much of the evidence presented in this case was gathered by testers acting on behalf of the Northwest Indiana Open Housing Center. The tests were arranged and coordinated by Janet Dermody, investigator at the Center. Dermody instructs testers to present themselves as interested homeseekers. Their primary task is to determine apartment availability. Instructions to the tester may also include a general role description which they are told to assume during the test. Dermody testified that for the purpose of these tests, the testers need not be identically matched.

67. Dermody testified that the Anderson and Hanley audits were performed as a cursory study to determine if there were

indeed any apartments available. Following their audits, the testers made oral reports to Dermody. Based on these initial results, the Center staff decided to conduct a more extensive test.

68. The Johnsons and the Shirases participated in this second group of tests. Both couples appeared at The Mansards as husband-wife teams, and they visited the Rental Agent there within a half-hour of each other.

69. The tests conducted by auditors Jones, Brisco, Cochran, Seddlemeyer, and McCrady were not conducted in direct response to the Davises' complaint at the Center.

70. Mr. and Mrs. Davis were hurt and humiliated by The Mansards' and its agents' treatment of their application. Their anger and hurt persists today. That treatment did not, however, affect their actions with regard to the sale of their home nor did it affect Mr. Davis at his workplace.

71. Mr. and Mrs. Johnson were hurt and humiliated when The Mansards and its agents discouraged them from completing an application. Their family life was disrupted for days. Their anger and hurt persists today.

72. The Northwest Indiana Open Housing Center made little, if any, effort to conciliate with The Mansards prior to its participation in this lawsuit. Maurice McGough, Executive Director of the Center, estimates that one complaint in ten received at the Center results in a suit. Transcript, June 7, at p. 102. Nevertheless, the Center has incurred costs through this litigation and the suit has put the Center in a litigious posture vis-a-vis local landlords with whom it wishes to establish a cooperative relationship. The activities of The Mansards and its agents which gave rise to this lawsuit frustrated the goals of the Northwest Indiana Open Housing Center.

## CONCLUSIONS OF LAW

1. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and § 1343(4), and 42 U.S.C. § 3601 et seq.

2. The Civil Rights Act of 1866, 42 U.S.C. § 1982, provides:

All citizens of the United States shall have the same right, in every state and territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property.

42 U.S.C. § 1982.

3. Title VIII of the Civil Rights Act of 1968 (The Fair Housing Act), 42 U.S.C. § 3604 provides in pertinent part:

"it shall be unlawful—

(a) To refuse to sell or rent after the making of a bonafide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services of facilities in connection therewith, because of race, color, religion, sex, or national origin.

. . . .

(d) To represent to any person because of race, color, religion, sex, or national origin, that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."

42 U.S.C. § 3604.

4. The provisions of 42 U.S.C. § 1982 apply to defendants Phyllis Reznik Miklusak, James Lauerman and The Mansards corporation, to plaintiffs Bessie Mae Davis and Wesley Davis, Jr., and to units in the Mansards apartment complex in Griffith, Indiana.

5. The provisions of 42 U.S.C. § 3604(a), (b) and (d) apply to all defendants and to all plaintiffs in this case, and to the units in The Mansards apartment complex in Griffith, Indiana.

6. Defendant Miklusak, an agent of defendants Lauerman and The Mansards

corporation, failed to offer plaintiffs Bessie Mae Davis and Wesley Davis Jr. an available apartment for which they applied and were qualified, and misrepresented to them the availability of apartments, because of the Davises' race. This conduct directly violated 42 U.S.C. § 1982 because it denied to black citizens of the United States the same right to lease real property that is enjoyed by white citizens. This conduct directly violated 42 U.S.C. § 3604(a), (b) and (d), because it amounted to a refusal to rent, and an effort to make unavailable or deny a dwelling because of race; because it discriminated in the terms and conditions of rental of a dwelling because of race; and because it amounted to a representation because of race that a unit was not available for rental, when in fact units were available.

7. Defendant Lauerman, a principal of defendant Miklusak and agent of the defendant Mansards corporation, caused to be produced, signed and authorized dissemination of a letter telling the Davises that no units were available at a time when units were in fact available. This conduct directly violated 42 U.S.C. § 1982, because it denied to black citizens of the United States the same right to lease rental property that is enjoyed by white citizens. This conduct also directly violated 42 U.S.C. § 3604(a), (b) and (d), because it amounted to an effort to make unavailable or deny a dwelling because of race; because it discriminated in the terms and conditions of rental of a dwelling because of race; and because it amounted to a representation because of race that an available apartment was not available.

8. Defendant Patrice Burke, an agent of defendants Lauerman and The Mansards corporation, misrepresented to plaintiffs Glindolyn and Cecil Johnson the availability of apartments, and refused to let them fill out an application or place a deposit for an apartment, because of the Johnsons' race. This conduct directly violated 42 U.S.C. § 3604(a), (b) and (d), because it amounted to a refusal to negotiate a rental, and an effort to make unavailable a dwelling because of race; because it discriminated in the terms and conditions of rental of a dwelling because of race; and because it amounted to a representation because of race that an available apartment was not available.

9. Defendants Miklusak, Burke, Lauerman and The Mansards, Inc., engaged in a systematic practice of discrimination against black applicants and homeseekers that frustrated the counseling and referral services, drained the resources and hindered the mission of the Northwest Indiana Open Housing Center. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). This directly violated 42 U.S.C. § 3604(a), (b) and (d), because it amounted to a pattern of refusals to rent, or to negotiate for rent and to make otherwise unavailable or deny dwellings because of race; because it discriminated in terms, conditions and privileges of rental because of race; and because it represented, because of race, that dwellings in fact available were not available.

10. Defendants Miklusak, Lauerman and The Mansards, Inc., acted wantonly and willfully with intentional disregard of the Davises' civil rights. Punitive damages are appropriate. See Phillips v. Hunter Trails Community Association, 685 F.2d 184, 191 (7th Cir.1982); Jeanty v. McKey and Poague, Inc., 496 F.2d 1119, 1121 (7th Cir.1974).

11. Defendants Burke, Lauerman and The Mansards, Inc., acted wantonly and willfully, with the intentional disregard of the Johnsons' civil rights and punitive damages are appropriate. Phillips, 685 F.2d at 191; Jeanty, 496 F.2d at 1121.

12. Defendants Miklusak, Burke, Lauerman and The Mansards, Inc., by engaging in a systematic practice of discrimination against black homeseekers, frustrated the counseling and referral services and hindered the mission of the Northwest Indiana Open Housing Center. See Havens, 455 U.S. at 379, 102 S.Ct. at 1124. This conduct was wanton and willful and was an

intentional disregard of black homeseekers' rights, for which punitive damages are appropriate. *See Phillips*, 685 F.2d at 191; *Jeanty*, 496 F.2d at 1121.

■ 13. Defendant rental agents Miklusak and Burke acted as agents of defendant General Manager Lauerman and defendant The Mansards, Inc., under theories of respondeat superior and non-delegable duties. *Moore v. Townsend*, 525 F.2d 482, 485 (7th Cir.1975). Defendants Lauerman and The Mansards, Inc., are vicariously liable for the civil rights violations committed by agents Miklusak and Burke.

■ 14. Defendant General Manager Lauerman is an agent of defendant The Mansards, Inc., under theories of respondeat superior and non-delegable duties. *Moore*, 525 F.2d at 485. Defendant The Mansards, Inc., is vicariously liable for the civil rights violations committed by James R. Lauerman.

■ 15. Each Plaintiff is entitled to appropriate injunctive relief, actual damages and punitive damages of $1,000.00, together with court costs and attorneys fees from each defendant, under the Fair Housing Act, 42 U.S.C. § 3612.

16. Plaintiffs Bessie Mae Davis and Wesley Davis, Jr., are entitled to actual damages for emotional distress and loss of civil rights; to unlimited punitive damages; and to attorneys fees from Defendants Miklusak, Lauerman, and The Mansards, Inc., under 42 U.S.C. § 1982.

17. An award to Bessie Mae Davis and Wesley Davis, Jr. of $10,000.00 each in actual damages, and of $15,000.00 each in punitive damages is proper in this case. Defendants Miklusak, Lauerman and The Mansards, Inc., are jointly and severally liable for this award.

18. An award to Glindolyn Johnson of $5,000.00 in actual damages is proper in this case. Defendants Burke, Lauerman and The Mansards, Inc., are jointly and severally liable for this award.

19. An award to Glindolyn Johnson of $1,000.00 in punitive damages, is appropriate in this case. Defendants Burke, Lauerman, and The Mansards, Inc., are jointly and severally liable for this award.

20. An award to Cecil Johnson of $2,500.00 in actual damages is proper in this case. Defendants Burke, Lauerman and The Mansards, Inc., are jointly and severally liable for this award.

21. An award to Cecil Johnson of $1,000.00 in punitive damages, is appropriate in this case. Defendants Burke, Lauerman and The Mansards, Inc., are jointly and severally liable for this award.

22. An award to the Northwest Indiana Open Housing Center of $1,000.00 plus $4,280.00 costs in actual damages is proper in this case. All defendants are jointly and severally liable for this award.

23. An award to the Northwest Indiana Open Housing Center of $1,000.00 in punitive damages, is proper in this case. Defendants Miklusak, Burke, Lauerman and The Mansards, Inc., are jointly and severally liable for this award.

24. A total award of $42,627.00 attorneys fees plus costs in the sum of $7,026.50 is appropriate in this case.

25. Affirmative injunctive relief is appropriate in this case.

## DISCUSSION

### 1. Differential treatment

The facts of this case are disquietingly familiar. *See Richardson v. Howard*, 712 F.2d 319 (7th Cir.1983); *Metro Fair Housing Services v. Morrowood Garden Apts.*, 576 F.Supp. 1090 (N.D.Ga.1983). Mr. and Mrs. Davis visited The Mansards, were greeted cordially by the Rental Agent, and were deliberately given misinformation regarding apartment availability. The Davises, the Johnsons, Ms. Hanley, Dr. Linton, Dr. Moore, and Ms. Jones were discouraged from applying to The Mansards, or from hoping that The Mansards would accept their application. White apartment seekers who visited The Mansards during the time that the Davises' application was pending were encouraged to apply and told

the truth about their chances of being assigned an apartment. There is a pattern; it appears that race was a determinative factor in each potential applicants' treatment.

No one could say that The Mansards were indiscriminately racist during the period in question. The complex does rent to blacks and in significant numbers. But The Mansards, through its agents, apparently seeks to control the complex's black population by discouraging all negro applicants, allowing a few of the most promising apartment seekers to apply, and finally choosing to rent only to those black applicants who pass some secret test unrelated to apartment availability. White applicants are not subjected to such scrutiny. There are, of course, persons of all races who represent significant credit risks, and who The Mansards would discourage for legitimate business reasons. The facts show, however, a pattern of treating black and white apartment seekers of similar background and earnings differently, to the detriment of the blacks.

At trial, the defendants desperately pounced upon every stray fact which might distinguish these black applicants from their white counterparts—perhaps the Davises' home posed a problem, Hanley's husband wasn't present, the Johnsons were unsure of when they wished to move, Moore needed a ground floor apartment, Jones visited the wrong rental office. Even if these differences would be material to the ultimate outcome, i.e. whether or not the apartment seeker finally rented at The Mansards, they do not adequately explain the differential treatment apparent prior to application and during an application's pendancy.

The Mansards is in the business of renting apartments. A rental agent's job is to urge potential applicants to formulate a plan, to help resolve problems which may prevent a move, and to encourage a commitment from the potential renter. The problems which loomed so large when blacks presented themselves at The Mansards rental office were found surmounta-ble when a desirable white applicant appeared. The Shirases' home was not perceived as an obstacle to their move. Despite their professed uncertainty about both the move and the timing, Rental Agent Burke offered them the two-bedroom unit of their choice at a time of the Shirases' choosing. Where Dr. Moore was discouraged because of the scarcity of ground floor units, Caroline McCrady was immediately assigned such a unit upon her visit to The Mansards four days later. Testers Cochran and Seddlemeyer were assigned a ground floor unit on their first visit to The Mansards, available within 25 days. Anderson was told that an appropriate apartment was available though she never filled out an application. None of the black testifying at trial were told frankly, prior to scrutiny by the complex, that they could be accommodated.

It is a half-truth to assert, as did the defendants, that apartments were not available because they were being cleaned or repaired. The Mansards is a huge complex. The records submitted during trial indicate that, as each applicant or tester requested an apartment, one of the type requested was available or would be available shortly.

■ A prima facie case of housing discrimination under both the Fair Housing Act and the 1866 Civil Rights Act consists of the following points of proof:

(1) that the plaintiff is a member of a racial minority;

(2) that he or she applied for and was qualified to rent or purchase a certain property or housing;

(3) that he or she was rejected; and

(4) that the housing or rental opportunity remained available thereafter.

*See Phillips v. Hunter Trails Community Ass'n,* 685 F.2d 184, 190 (7th Cir.1982); *Phiffer v. Proud Parrot Motor Hotel, Inc.,* 648 F.2d 548 (9th Cir.1980); *Shaw v. Cassar,* 558 F.Supp. 303, 312 (E.D.Mich.1983). It is beyond dispute that the Davises, as applicants, and the Johnsons, as testers, have proved their prima facie case.

The Davises received a form letter indicating that they would be contacted when an appropriate apartment became available; eleven months later, their deposit was returned. They had never been contacted about available apartments. In effect, the Davises were rejected though their application was formally approved. When they resubmitted their application, The Mansards grudgingly offered to show them an apartment quite unlike the model which they requested. It is not clear from the record whether this apartment was in fact offered to the Davises. It is apparent, however, that suitable units became available during the year when the Davises' application was pending, and that those units were assigned to other applicants without notice to the Davises. The Davises are black, they applied for an apartment at The Mansards and were found to be qualified, they were effectively rejected, and the Davises were passed over for rental opportunities which remained available thereafter.

The Johnsons present an easier case—their application was not even taken, though they were qualified to apply for a Mansards unit. A unit such as the one they had requested was offered to the Shirases a scant hour after the Johnsons were told that no units were available.

■ Once the plaintiff has established a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by introducing evidence that the plaintiff was rejected "for a legitimate and non-discriminatory reason." *Id.* The defendants offered alternative reasons for rejecting the Davises and the Johnsons. None are credible.

The defendants argue that the Davises indicated that their rental was contingent on sale of their home, and that no unit was assigned because The Mansards was waiting to be informed of the sale. This argument is unbelievable for two reasons. First, the Davises simply did not need to sell their home in order to rent at The Mansards. They could afford to do both. And the Davises had made tentative arrangements with their son to take over the home if they successfully arranged a rental. There was no reason for the Davises to present this state of affairs to the Rental Agent as an obstacle to their move. It was not an obstacle, and the Court does not accept that the Davises presented it as such to The Mansards' agent.

Secondly, the idea that the onus was on the Davises to contact The Mansards is belied by the form letter which the Davises received. They were explicitly informed that The Mansards would contact them. The Mansards knew the content of this letter. Judging from the Shirases' experience, the Mansards rental agents were accustomed to following up on applications by contacting the applicants. The defendants' assertion that the Davises' application lapsed solely because of the Davises' inaction is not an adequate explanation.

As to the Johnsons, the defendants assert that the rental agent was given conflicting information regarding when the couple needed the apartment. Again, this does not explain the failure to even take their application. At most, the discrepancy between Cecil and Glindolyn Johnson's answer was six weeks—speaking on April 13, Cecil wanted the apartment "about June" and Glindolyn requested it "any time." A rental agent seeking to rent an apartment would push the waivering couple to agreement on a date certain. Instead, the Johnsons were told to go home and think about making an application.

The defendants have not shouldered their explanatory burden with respect to the Davises or the Johnsons. The Court therefore finds that the defendants have violated Title VIII, 42 U.S.C. § 3601 *et seq.*, and the 1866 Civil Rights Act, 42 U.S.C. § 1982 by engaging in housing discrimination.

2. Damages

The Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, provides for recovery of actual damages and no more than $1000.00 punitive damages for each act of discrimination. 42 U.S.C. § 3612(c). *See Phillips v. Hunt-*

er Trails Community Ass'n, 685 F.2d 184, 191 (7th Cir.1982). The Civil Rights Act of 1866, 42 U.S.C. § 1982, has no punitive damage limitation. Phillips, 685 F.2d at 184.

Each of the plaintiffs, including the testers and the Northern Indiana Open Housing Center, have standing to sue and recover damages under the Fair Housing Act. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); Phillips, 685 F.2d at 190–91 (7th Cir.1982). By the terms of § 1982, only Bessie Mae Davis and Wesley Davis can recover under that statute.

The § 3612(c) award of $1000.00 punitive damages is appropriate when the court finds that the defendants acted willfully and wantonly, in malicious disregard of the plaintiffs' rights. See Seaton v. Sky Realty Co., 491 F.2d 634 (7th Cir.1974). A certain degree of malevolence must be present to warrant an award of punitive damages. See Crumble v. Blumthal, 549 F.2d 462 (7th Cir.1977). These requirements are met in the case at bar. The discrimination was intentional. The rental agents were savvy enough to hide their heightened scrutiny of black applicants behind smiles and pleasantries. They were unconcerned about the effect that their administrative delays and stalling might have on the applicants' plans. Though these acts were carried out by the rental agents, punitive damages can be assessed against Lauerman and The Mansards, Inc. under the doctrine of respondeat superior if they knew of or ratified discriminatory acts of their employees or agents. Marr v. Rife, 503 F.2d 735 (6th Cir.1974). Accordingly, the defendants are jointly and severally liable to each plaintiff for punitive damages in the amount of $1000.00 under 42 U.S.C. § 3612(c).

Bessie Mae Davis and Wesley Davis, Jr. are additionally entitled to actual damages under 42 U.S.C. § 1982. These are assessed at $10,000.00 each, for emotional distress and loss of civil rights. This is in line with the compensatory damages awarded by the Seventh Circuit Court of Appeals in Phillips for anger and hurt of similar dimensions. See also Parker v. Shonfeld, 409 F.Supp. 876 (N.D.Cal.1976) ($10,000 for humiliation and embarrassment).

The punitive damage award under § 1982 is the place where "the willfulness of the [Mansards] conduct is appropriately weighed." Phillips, 685 F.2d at 191. The record contains ample evidence of the intentional disregard of the Davises' rights. Further, a summary of The Mansards' financial position for 1983 is contained in Plaintiffs' group exhibit 35. The corporation's current assets were $161,915.29. The great bulk of The Mansards assets were in notes receivable or, we assume, rentals. The Mansards current liabilities were only $4,874.86 in accrued payroll taxes. Total assets and total liabilities balanced at $271,128.70. As in Phillips, The Mansards can readily raise money by rent hikes if necessary. The punitive damages will cause The Mansards some hardship, but that is an essential part of their deterrent function. Accordingly, plaintiffs Bessie Mae Davis and Wesley Davis, Jr. are each awarded $15,000.00 in punitive damages, for which the defendants are jointly and severally liable.

The evidence also supports the award of actual damages to both Glindolyn and Cecil Johnson for the humiliation and emotional distress arising from their audit to The Mansards. Mrs. Johnson's testimony left no doubt that she was deeply affected by the realization that The Mansards had not given fair consideration to her application. This decimated Mrs. Johnson emotionally, hampered her relationship with her husband Cecil, and with the rest of her family. The fact that Mrs. Johnson was a tester does not affect the measure of her actual damages. In 1984, no one should have to toughen themselves to racial discrimination—a tester has no reason to expect mistreatment at the hands of ostensibly fair-minded businesspeople. Given Mrs. Johnson's distress, we believe that an award of $5000.00 in actual damages is appropriate.

Mr. Johnson was much less profoundly affected by The Mansards treatment. For whatever reason, he approached the complex with a degree of cynicism which Mrs. Johnson lacked, and was consequently steadied for the blow of the Shirases' report. Nevertheless, Mr. Johnson suffered through his wife's depression while sustaining his own reopened wounds. Mr. Johnson is due an award of $2500.00 in actual damages.

Under 42 U.S.C. § 3601, *et seq.*, the Housing Center can recover its actual damages. It is clear that this litigation has not enhanced the cooperation between the Housing Center and local landlords. On the other hand, the goals of this litigation are within the scope of the Center's purpose. And the outcome of this litigation will further the Center's goals and perhaps provide it with additional leverage in its continued negotiations with other area apartment complexes.

This lawsuit frustrates a portion of the Center's mission while directly addressing another aspect of its stated goals. In light of this dual effect, actual damages specifically awarded for frustrating the Center's mission will be limited to $1000.00. The Center's compensatory damages also include costs, figured at $4,280.00, for which the defendants are additionally liable.

As prevailing parties, the plaintiffs are entitled to attorneys fees under 42 U.S.C. § 1982. *See Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Gautreaux v. Chicago Housing Authority*, 690 F.2d 601 (7th Cir.1982). The Petitions for Fees and Costs, with accompanying affidavits, were submitted by the plaintiffs on June 18 and 19, 1984. The defendants raised issue with the need for the litigation, but did not dispute the method used to assess the fees. *See generally Blum v. Stenson*, —— U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

The defendants' objection on the ground that the litigation was unnecessary is not persuasive. The suit was not frivolous within the meaning of *Nadeau v. Helgamoe*, 581 F.2d 275, 278 (1st Cir.1978) (cited with approval in *Hensley*). No "special circumstances" argue against the award. *Id.* On the contrary, the parties have succeeded on all significant issues in the suit and have achieved the benefit which they sought in bringing the suit. *Id.* at 278. *See also Lenard v. Argento*, 699 F.2d 874 (7th Cir.1983); *Crosby v. Bowling*, 683 F.2d 1068 (7th Cir.1982); *Harrington v. DeVito*, 656 F.2d 264 (7th Cir.1981); *Busche v. Burkee*, 649 F.2d 509, 521 (7th Cir.1981). An award of $28,659.00 in attorneys fees to the plaintiffs is therefore appropriate for the services of Ruth Hennage; for F. Willis Caruso, the amount assessed is $9,513.00; for Elizabeth Shuman-Moore's work, the amount assessed is $4,455.00. The costs of litigation equal $7,026.50 and are also assessed against the defendant, to be paid directly to counsel for the plaintiffs.

### 3. Injunctive relief

The public interest in abolishing racial discrimination dictates that the defendants be held to a continuing high standard of fair dealing. *See generally Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417 (11th Cir.1984). It is therefore ORDERED that:

1. Defendant The Mansards, Inc., and its successors or assigns, shall take applications of all prospective renters on an open and impartial basis and shall rent to eligible persons based on the date of application and the date such person desires to occupy the unit. All applicants shall be fully advised of the procedure and criteria of such rental policy.

2. The current staff of The Mansards, Inc., shall be trained by the Northwest Indiana Open Housing Center, 650 South Lake Street, Gary, IN 46403, within sixty (60) days of the entry of this Order. Such training will deal with equal opportunity management and will include a review of Federal, State and local laws and the requirements of non-discriminatory renting. The Center shall be paid Two Hundred Fifty Dollars ($250.00) for the session.

3. The Defendant The Mansards, Inc., and its successors or assigns, are ordered to include in their advertising, the fair housing logo in display ads, and the words "equal opportunity housing" in any classified ads.

4. The Defendant The Mansards, Inc., and its successors or assigns, are ordered to include in all advertising and newspapers and telephone directories, and on all stationery specifically for the apartment complex, forms, signs, pamphlets, and brochures utilized by the Defendant in the operation of its apartment business, the words "equal housing opportunity" and the fair housing logo. These words and the logo shall be prominently placed and easily legible.

5. The Defendant The Mansards, Inc., and its successors or assigns, are ordered to redesign any brochures for use in describing and advertising housing units at The Mansards in Griffith, Indiana, and if they portray people, then they shall include minority group persons. The brochure shall make clearly visible to the reader that The Mansards offers equal opportunity housing. Said redesign of any brochure shall be completed within one (1) year of the date of this Order. The Mansards, Inc., or its successors or assigns, shall post and maintain, in a manner conspicuous to tenants and prospective tenants at the complex known as The Mansards, the HUD poster identified as number 928.1 (7–75) or the HUD poster, if any, which is subsequently printed which contains similar language regarding equal opportunity in housing.

6. The Defendant The Mansards, Inc., is ordered to obtain the names and addresses and telephone numbers of all who inquire in person at the rental offices of The Mansards Complex about availability of apartments, but do not complete applications. This information is to be preserved for inspection and copying by Plaintiffs' representatives for a period of five (5) years from the entry of this Order. Defendant shall indicate in such records the race, sex, and color of such applicants, as well as the disposition of the inquiries.

7. The Defendant The Mansards, Inc., is ordered to maintain a list of all applicants, with the name, address, telephone number, race, sex and color as well as the disposition of the application. The reason for rejection of any application shall be noted in writing. Such records shall be maintained for five years.

8. The Defendant The Mansards, Inc., is ordered to preserve all records which are the source of, or contain, any of the information pertinent to Defendant's obligations under this Order. Representatives of the Plaintiffs shall be permitted to inspect and copy all pertinent records of the Defendant at any and all reasonable times, provided, however, that the Plaintiffs shall endeavor to minimize any inconvenience to the Defendant from the inspection of such records.

9. The Defendant The Mansards, Inc., is ordered to advise counsel for plaintiffs in writing within thirty (30) days of all complaints received by the Defendant, both formal and informal, regarding equal opportunity in housing at The Mansards Complex.

10. This Order regarding affirmative relief shall be binding upon The Mansards, Inc., and its respective successors-in-interest, subsidiaries, agents, employees, servants and all persons in active concert with them, and shall be binding and control the property described in the Complaint in the above-captioned cause.

*Conclusion*

It is therefore ORDERED that the plaintiffs have prevailed in this action under 42 U.S.C. § 3601 et seq. and 42 U.S.C. § 1982. Damages are awarded as outlined in the above Order. The Clerk of the Court is directed to enter judgment accordingly.