Arneda L. HAMILTON,
Plaintiff-Appellee,

v.

Stephen SVATIK and Eleanor Svatik,
Defendants-Appellants.

No. 85–1004.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1985.

Decided Dec. 13, 1985.

Rehearing Denied Jan. 29, 1986.

William J. Harte, Chicago, Ill., for defendants-appellants.

Frona C. Daskal, Mandel, Lipton & Stevenson, Ltd., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and CAMPBELL Senior District Judge.*

CUDAHY, Circuit Judge.

The plaintiff, a black woman, filed a complaint on May 25, 1979, in the District Court for the Northern District of Illinois, alleging that the defendants' refusal to rent an apartment to her constituted a violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982, and the Fair Housing Act, 42 U.S.C. § 3604.[1] A temporary restraining order, prohibiting the defendants from renting the apartment to anyone else, was entered in June 1979. A trial was held in November 1984. The jury returned a verdict in favor of the plaintiff and against the defendants in the amount of $12,500 in compensatory damages, $2,500 in punitive damages against Eleanor Svatik and $5,000 in punitive damages against Stephen Svatik. Judgment was entered on the verdict.

---

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. The plaintiff amended her complaint on May 7, 1980, to include Eleanor Svatik as a defendant.

Defendants appeal and we affirm in part and reverse in part.

Plaintiff, Arneda Hamilton, a black woman, was twenty-nine years old at the time of the incident. She had a Bachelor's degree in Business Administration and was employed by Central States Southeast and Southwest Areas Pension Fund. Stephen Svatik, one of the defendants, is a white man. He was seventy-eight at the time of trial. He held a law degree from Northwestern University, although he had never practiced law. Eleanor Svatik is his sister. They inherited the property in question from their brother. Stephen quitclaimed his interest to her, making Eleanor the sole owner of the building. Stephen runs the building. They live together and maintain a joint bank account into which rent checks are deposited.

The parties presented competing versions of the facts to the jury. Plaintiff argued that she had answered an advertisement on May 20, 1979, for an apartment at 4653 North Kiona, in Chicago. When she called the indicated telephone number a man answered and she inquired about the apartment. The man asked the plaintiff her age and she told him she was twenty-nine. He told her the tenants in the building were primarily elderly and made arrangements for her to see the apartment between 5:15 and 5:30 that evening. When the plaintiff arrived at the apartment building she waited in her car until Stephen drove up in a blue and white car. When he began to get out of his car, she got out of her car and started to walk back to his car. Stephen began to get back into his car. Plaintiff identified herself as the person who had called about the apartment and asked if he were going to show her the apartment. He looked straight ahead and said "No," to which plaintiff responded "Don't be prejudiced." Stephen looked directly at her and told her that that was his prerogative. He then drove away. Plaintiff got into her car, wrote down his Illinois license plate number and left. Plaintiff testified that she was very upset and began to cry. She

stopped her car and telephoned a friend. She sat in her car for twenty to twenty-five minutes before driving home. When she arrived home she called her mother and some friends.

The next day she called the NAACP. She then contacted the Leadership Council and spoke to Jack Woltjen, a white man. Woltjen agreed to attempt to see the apartment if it were still available. Plaintiff and Woltjen met at a restaurant near the apartment. He went to see the apartment and fifteen minutes later she followed and waited outside the doorway. After being shown and offered the apartment by Stephen, Woltjen explained that the apartment was for a woman who had tried to see the apartment a few days earlier and who was waiting downstairs. Stephen then accused Woltjen of being a "government man" and called him a "troublemaker." He said that he knew about "them" and did not have to rent the apartment to "them"; he rented only to old women, and the plaintiff did not make enough money. When they went downstairs Stephen recognized the plaintiff and said that he would not rent the apartment to her because she could not afford it. Woltjen commented that Stephen had not even asked the plaintiff how much she earned. Stephen then did so and the plaintiff responded that she earned $20,000 annually.[2] Stephen said that it would not work, he rented only to old women and single men. He refused to show her the apartment, but as he walked toward his car he said "I'll show it to her, but it won't make any difference."

The parties subsequently attempted to resolve the matter before the Human Rights Commission, but Stephen failed to attend the second session. In September the plaintiff and Stephen accidentally met in a parking lot. Stephen told her that she could have the apartment; she told him to contact her lawyer. Stephen never contacted her or her lawyer. Subsequently the plaintiff found another apartment with a higher rent.

**2.** Woltjen testified that she said $19,000.

Plaintiff testified that she was extremely upset by the incident and continued to be for several months. This was the first time she had experienced discrimination. She was unable to look for another apartment until November because she was afraid of being turned down again. She became shyer, more withdrawn, less confident of herself and less trusting of others. She questioned whether people, especially her white friends, really liked her. She had not had such qualms before the incident.

The defendants tell a different tale. Stephen claims that he desired to rent the apartment to an elderly person. The tenants of the building were all white and at least sixty years old, except for one black-Puerto Rican woman in her fifties. Further, Stephen could not rent the apartment without the approval of Benjamin Shapiro, who handled his brother's estate, because title to the property was held by the estate. Stephen said that he received a call about the apartment from someone who sounded like an elderly woman. He told the caller that only elderly people lived there and the caller said that she was an elderly woman. He asked for the telephone number of the management office where she currently lived and for references. Stephen agreed to show her the apartment, and told her that she would have to stand in the doorway to be identified.

Stephen checked the caller's references and called the management office where she lived. The building manager told him that the plaintiff was paying $210 a month and was behind in her rent. Stephen drove his red Chevrolet (with Wisconsin license plates) to the North Kiona apartment building, saw no one in front of the building and kept going, driving past the building without stopping.

Defendants basically agree with plaintiff's account of the encounter with Woltjen, although Stephen did not testify to making all of the statements that Woltjen attributed to him. Defendants, however, assert that at Stephen's encounter with the plaintiff in the parking lot, the plaintiff said she did not want to move into the apartment. Stephen claims to have subsequently instructed his attorney to offer the apartment to the plaintiff.

Defendants also emphasize that subsequent to the incident the plaintiff did not take time off from work, receive psychiatric care or join a black organization. In fact, the plaintiff was promoted several times at work.

### I.

The Fair Housing Act prohibits the following conduct:

> To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

42 U.S.C. § 3604(a). Section 1982 provides:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982. While section 1982 requires proof of discriminatory intent, *see General Building Contracts Association, Inc. v. Pennsylvania,* 458 U.S. 375, 388, 390 n. 17, 102 S.Ct. 3141, 3148, 3149 n. 17, 73 L.Ed.2d 835 (1982), section 3604 does not. *Kaplan v. 442 Wellington Cooperative Building Corporation,* 567 F.Supp. 53, 56 (N.D.Ill.1983). Under section 3604 a plaintiff establishes a prima facie case by showing that 1) she belongs to a minority; 2) the defendant was aware of it; 3) the plaintiff was ready and able to accept defendant's offer to rent; and 4) the defendant refused to deal with her. *See Kaplan,* 567 F.Supp. at 56. The burden then shifts to the defendant to show that he acted without any discriminatory intent. *Id.* The defendant's evidence of a good reason for refusing to deal with the plaintiff "must be devoid of circumstances from which it can be inferred that there was a real though subtle purpose of discrimination." *Id.*

The defendants claim that the jury's verdict is against the manifest weight of the evidence because Stephen testified that he did not meet plaintiff until he showed the apartment to Woltjen. They contend that, even if plaintiff had established a prima facie case, they had good business reasons for not renting to her: they preferred elderly tenants and Stephen testified that he had been told that plaintiff was behind in her rental payments. Further, they claim that a judgment against Eleanor cannot stand because there is no evidence of any involvement on her part.

■ We note initially that a "jury verdict will not be set aside if a reasonable basis exists in the record to support the verdict." *Continental Casualty Co. v. Howard,* 775 F.2d 876, 882 (7th Cir.1985); *see Spesco, Inc. v. General Electric Co.,* 719 F.2d 233, 237 (7th Cir.1983). There clearly was a reasonable basis in the record for concluding that plaintiff had established a prima facie case under section 3604. The jury simply may have believed plaintiff's story rather than defendant's story. Further, there was sufficient evidence before the jury from which it could have concluded that the defendants had no good business reason for refusing to rent to plaintiff. Stephen asserted that plaintiff could not afford the apartment before he could have known the amount of her income. Her substantial salary clearly made the apartment affordable. Stephen's testimony that he was told that plaintiff was behind in her rental payments was uncorroborated and contradicted by plaintiff. Further, Stephen's claim that he rented only to elderly persons was impeached by his own deposition testimony that Ms. Feliciano, one of his tenants, was, according to his estimate, in her thirties or forties.

■ There was also sufficient evidence from which the jury could have inferred a discriminatory intent, and thus have found a violation of section 1982. There was testimony that Stephen stated that it was his prerogative to be prejudiced and that he didn't have to rent to "them." Further, the evidence will support the conclusion that there was no good business reason for his willingness to rent to Woltjen and unwillingness to rent to plaintiff. One may infer from these circumstances a discriminatory intent.

■ Although there may be no evidence of Eleanor's involvement in the incident, it is undisputed that she is the sole owner of the building and that her brother acts as her agent. In cases of racial discrimination in housing, a principal is liable for the wrongful acts of its agent. *See Moore v. Townsend,* 525 F.2d 482, 485 (7th Cir.1975); *Davis v. Mansards,* 597 F.Supp. 334, 344 (N.D.Ind.1984); *Izard v. Arndt,* 483 F.Supp. 261, 263 (E.D.Wis.1980). In *Izard* Mr. Arndt argued that he could not be responsible for Mrs. Arndt's refusal to rent to the plaintiffs because he was out of state at the time, she had the sole responsibility for renting the house and he had never authorized her to engage in discrimination. The court held that Mr. Arndt was liable because she had been acting as his agent and her actions were within the scope of her apparent authority.[3] *Id.*

## II.

■ Defendants' second contention is that the jury award of $12,500 in compensatory damages is excessive. Approximately $500 of the award compensates the plaintiff for additional rent and transportation expenses she incurred because of defendants' refusal to rent to her. The remainder of the award is for intangible injuries such as humiliation, emotional distress and embarrassment. Apparently it is the award of $12,000 for intangible injuries that defendants protest.

A jury's damage award should not be disturbed so long as it is not "so large as to shock the conscience of the court." *Hintz*

3. *Hollins v. Kraas,* 369 F.Supp. 1355 (N.D.Ill. 1973), cited by the defendants, is distinguishable. In *Hollins* the contract buyers had sole and exclusive rights of possession, management, use and control of the building. The contract buyers were not the agents of the owners or of the bank holding title to the property in trust.

v. Jamison, 743 F.2d 535, 539 (7th Cir.1984) (citing Huff v. White Motor Corp., 609 F.2d 286, 296 (7th Cir.1979)). Although the award for intangible injuries here comes very close to being excessive, we cannot say that this award "shocks our conscience." More than three years ago we awarded $10,000 to each of two plaintiffs for humiliation and embarrassment in a housing discrimination case. See Phillips v. Hunter Trails Community Association, 685 F.2d 184 (7th Cir.1982) (rejecting award of $25,000 each). Further, other cases have awarded damages for intangible injuries in similar amounts. See Davis v. Mansards, 597 F.Supp. 334 (N.D.Ind.1984) ($10,000 each for emotional distress and loss of civil rights); Shaw v. Cassar, 558 F.Supp. 303 (E.D.Mich.1983) ($10,000 each); Parker v. Shonfeld, 409 F.Supp. 876 (N.D.Cal.1976) ($10,000); see also Block v. R.H. Macy & Co., 712 F.2d 1241 (8th Cir.1983) ($12,402 for "mental anguish, humiliation, embarrassment and stress" from racially motivated dismissal from employment). Defendants claim that the defendants' actions in these cases were more egregious than in this case. It is difficult to weigh the relative severity of such intangible injuries and we cannot say the present case is so different from the cases cited that a reduction of compensatory damages would be required.

### III.

Defendants' next argument is that the record does not support the awards of punitive damages against Stephen and Eleanor, and even if it did, that the amount of the awards are excessive. Punitive damages are appropriate when the "defendants acted wantonly and wilfully ... or were motivated in their actions by ill will, malice, or a desire to injure the plaintiffs." Jeanty v. McKey & Poague, Inc., 496 F.2d 1119, 1121 (7th Cir.1974). There is more than sufficient evidence that Stephen acted wantonly and willfully in refusing to rent the apartment to plaintiff.

However, no evidence was presented from which the jury could conclude that Eleanor had acted willfully or wantonly. A principal is liable for punitive damages for the discriminatory acts of her agent only if she knew of or ratified the acts. See Davis v. Mansards, 597 F.Supp. 334, 347 (N.D.Ind. 1984). There is no evidence that Eleanor even knew of Stephen's actions. Punitive damages cannot be assessed against her merely because she owned the building and Stephen acted as her agent. Therefore the award of punitive damages against Eleanor must be reversed.

The award of $5,000 in punitive damages against Stephen is not excessive.[4] A jury's award of punitive damages should be set aside only if it exceeds what is required to serve the objective of deterrence and punishment. See McKinley v. Trattles, 732 F.2d 1320, 1327 (7th Cir.1984); Lenard v. Argento, 699 F.2d 874, 890 (7th Cir.), cert. denied, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983). Stephen's plea must fail under this standard. See Phillips, 685 F.2d 184, 191 ($100,000 in punitive damages); Davis v. Mansards, 597 F.Supp. 334, 347 (N.D.Ind.1984) (punitive damages totalling $30,000); Shaw v. Cassar, 558 F.Supp. 303, 316 (E.D.Mich.1983) (punitive damages totalling $10,000); see also Block v. R.H. Macy & Co., 712 F.2d 1241 (8th Cir.1983) ($60,000 in punitive damages for employment discrimination).

We affirm the award of $12,500 in compensatory damages and the award of $5,000 in punitive damages against Stephen, and reverse the award of $2,500 in punitive damages against Eleanor. Each party shall bear its own costs.

AFFIRMED IN PART AND REVERSED IN PART.

---

**4.** The Fair Housing Act limits awards of punitive damages to $1,000. 42 U.S.C. § 3612(c). However, there is no limit on the amount of punitive damages that can be awarded under 42 U.S.C. § 1982. See Phillips v. Hunter Trails Community Association, 685 F.2d 184, 191 (7th Cir.1982).