Sheila CATO, Joseph Cato and the Leadership Council for Metropolitan Open Communities, Plaintiffs,

v.

George JILEK and Beverly Jilek, Defendants.

No. 90 C 3993.

United States District Court, N.D. Illinois, E.D.

Nov. 15, 1991.

Edward A. Voci, Chicago, Ill., for plaintiffs.

Mary L. Sfasciotti, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Sheila ("Sheila") and Joseph ("Joseph") Cato (collectively "Catos") and The Leadership Council for Metropolitan Open Communities ("Council") sue George ("George") and Beverly ("Beverly") Jilek (collectively "Jileks") under 42 U.S.C. § 1982 ("Section 1982," part of the Civil Rights Act of 1866)[1] and under Fair Housing Act § 804 (Section 3604, part of Title VIII of the Civil Rights Act of 1968, Sections 3601–3619)[2] for alleged discrimination in the rental of housing. Plaintiffs and Jileks have now moved separately for summary judgment under Fed.R.Civ.P. ("Rule") 56.[3] For the reasons stated in this memorandum opinion and order, plaintiffs' motion is granted as to liability (but not yet as to damages), while Jileks' motion is denied entirely.

1. Section 1982 provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

All other citations to Title 42 provisions will also take the form "Section—."

2. Section 3604 provides in relevant part:

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

\* \* \* \* \* \*

(d) To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

## Facts

Sheila, a white woman, and Joseph, a black man, were married on September 12, 1990.[4] Two months earlier (on July 5) Sheila (then known as Sheila Smith) and Joseph had inspected an apartment at 1461 Balmoral, Westchester, Illinois ("the apartment") in a building owned by Jileks (G. Jilek Dep. 15, 18, 36–38; Smith Dep. 41). After they saw the apartment, Sheila told George that she wanted to rent the apartment and offered to put a deposit on it (Smith Dep. 38, 43–44; G. Jilek Dep. 41). She explained to him that she and Joseph planned to marry on September 12 and that Joseph would be moving into the apartment after they were married (D. 12(m) ¶ 15; Smith Dep. 38). George offered to send Sheila an application, but she told him that she already had a form of application at home (from another prospective landlord, but unused) and would send it to him (Smith Dep. 44–45; G. Jilek Dep. 41).

Sheila recalls that during the telephone conversation that took place between them

3. Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991) (citations omitted))—in the light most favorable to the nonmovant—in this case (1) plaintiffs as to Jileks' motion and (2) Jileks as to plaintiffs' motion. Where as here cross motions are involved, that principle thus demands a dual perspective—one that this Court has sometimes described as Janus-like—that sometimes causes the denial of both motions. In compliance with this District Court's General Rule ("GR") 12(m) and 12(n), the parties have tendered factual statements in support of and in opposition to Jileks' motion (respectively cited "D. 12(m) ¶ —" and "P. 12(n) ¶ —"). Fortunately those statements reveal no need for concern that the drawing of inferences in opposite directions could make the current exercise a dry run, because the factual differences that Jileks' counsel point to are not material (that is, outcome-determinative—*Shlay v. Montgomery,* 802 F.2d 918, 920 (7th Cir.1986)).

4. All relevant dates were during the year 1990, so that the year designation will be omitted from now on.

the next day,[5] George told her that the apartment was unavailable because the previous tenant had decided not to leave (Smith Dep. 47; Smith Aff. ¶ 10). Indeed, George's recollection is that he then told Sheila that he had actually rented the apartment to someone else (G. Jilek Dep. 54, 78), though he may also have said that he wasn't sure when the existing tenant was leaving (*id.* at 78). According to Sheila, a few days later George repeated his indisputably false story about the apartment's unavailability because the existing tenant was staying—this time when Sheila telephoned George on July 9 (Smith Aff. ¶ 10).

Council is an Illinois not-for-profit corporation that promotes integrated housing in the Chicago Metropolitan area (Amended Complaint ¶ 3). Jill Tivin ("Tivin") and John Kuhnen ("Kuhnen"), both of whom are white, were employees of Council during July 1990 (Kuhnen Aff. ¶¶ 2, 3; Tivin Dep. 9; Tivin Aff. ¶ 2). On July 10, acting as "testers"[6] for Council and thus posing as Mr. and Mrs. Williams ("Williamses"), Tivin and Kuhnen inspected the apartment. George decided to rent to the "Williamses" and accepted an application and deposit from Kuhnen on July 12 (G. Jilek Dep. 51; Kuhnen Dep. 27).

On July 13 plaintiffs filed suit here, alleging violations of Sections 1982 and 3604. This Court entered a Temporary Restraining Order prohibiting Jileks from renting the apartment to anyone other than Catos. On September 1 Jileks rented the apartment to Sheila (Amended Complaint ¶ 10).

After appropriate discovery by both sides, Jileks initially launched the efforts to obtain summary judgment, arguing that both Sheila and Joseph lack standing and that they have failed to prove the necessary elements of their Section 1982 and 3604 claims (D.Mem. 1). After Jileks' motion was fully briefed, plaintiffs cross-moved for summary judgment on the basis of the materials that were already before this Court.

### Standing

Jileks' argument that Sheila and Joseph lack standing rests essentially on their assertion that Joseph was not a prospective tenant on July 5. That in turn leads to their contention that Joseph was unaffected by their actions, will not benefit from this Court's intervention, and hence lacks standing to sue. As a variation on the same theme, Jileks assert that because Joseph was not a prospective tenant and because Sheila is white, Sheila also lacks standing to sue under Section 1982 and 3604. It should scarcely be a source of surprise that those arguments fail as a matter of both fact and law.

First, the record makes it clear that all parties did consider both Sheila and Joseph to be prospective tenants on July 5. Contrary to Jileks' current statements (D.Mem. 13–14; D.R.Mem. 2–5), Amended Complaint ¶¶ 6, 11 and 12 do allege that Jileks denied housing to *both* Sheila and Joseph and that *both* Catos thereby suffered injury redressable under Sections 1982 and 3604. And the discovery materials show that Jileks too considered Joseph to be a prospective tenant:

1. In response to plaintiffs' interrogatories, George referred to both Sheila and Joseph as potential tenants when he stated that "[t]he persons who were interested were the Plaintiffs," and when he explained "[t]he reason why Sheila Smith and Joseph Cato were not accepted ..." (G. Jilek Int. 13).

2. Both George and Beverly similarly referred to both Catos as prospective tenants throughout their depositions (see,

---

**5.** According to Sheila, she called George in the morning to ask whether the application should include information about Joseph, and George informed her that the apartment was unavailable when he returned her call that afternoon (Smith Dep. 47–48).

**6.** Testers investigate housing discrimination complaints by applying for apartments that have been denied to others when unlawful discrimination is suspected. Testers are generally selected so as to share all characteristics with the individuals who were rejected except for the suspect characteristic (Kale Williams Dep. 19–21—from a real, not fictitious, Williams).

e.g., the express plural references in G. Jilek Dep. 41, 53 and B. Jilek Dep. 34). In fact, Jileks' whole currently-advanced theory—that they denied Catos the apartment because Catos were an unmarried couple (something that went wholly unmentioned in George's original Answer filed in early August 1990, but was injected in May 1991 by Amended Answer ¶ 11)—has been premised on Jileks' view that Joseph was indeed a prospective tenant (see, e.g., B. Jilek Dep. 34).

Despite Jileks' current assertions, then, it is undisputed that Joseph was a prospective tenant of the apartment on July 5. Thus Joseph plainly has standing to allege race-based discrimination under Sections 1982 and 3604.

■ Nor is Sheila deprived of standing because she is white. Courts have consistently held that when a white person and a black person who live together are denied housing because of the black person's race, both parties are injured by that discriminatory treatment. Contrary to Jileks' position (D.Mem. 3–4; D.R.Mem. 6–7), that is so whether the two are married (see, e.g., *Hodge v. Seiler*, 558 F.2d 284 (5th Cir. 1977)), unmarried (see, e.g., *Thronson v. Meisels*, 800 F.2d 136 (7th Cir.1986) and *Lamb v. Sallee* 417 F.Supp. 282, 286 (E.D.Ky.1976)) or engaged to be married (see, e.g., *Treadwell v. Kennedy*, 656 F.Supp. 442, 443 (C.D.Ill.1987)).

Indeed, even if Joseph had not been a prospective tenant (as he was) Sheila still would have standing to sue under 1982 and 3604 for discrimination on the basis of her being engaged to a black man. There is no doubt that the fair housing statutes confer broad standing[7] and that white people have standing to sue for discriminatory housing practices that impair their right to associate with people of other races. As for the Fair Housing Act, *Trafficante v.*

*Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) notes that by its terms Section 3610 grants the right to seek judicial relief to "[a]ny person who claims to have been injured by a discriminatory housing practice" (*id.* at 208, 93 S.Ct. at 366) and (*id.* at 210, 93 S.Ct. at 367):

> While members of minority groups were damaged the most from discrimination in housing practices, the proponents of the legislation emphasized that those who were not the direct objects of discrimination had an interest in ensuring fair housing, as they too suffered.

*Trafficante, id.* at 208–12, 93 S.Ct. at 366–68 thus held that both white and black tenants of a large apartment complex had established injury in fact when they alleged that as a result of discriminatory rental practices they were denied the benefits of living together and associating with people who were not white. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 111–15, 99 S.Ct. 1601, 1613–15, 60 L.Ed.2d 66 (1979) similarly held that any member of a neighborhood had Title VIII standing to allege that the neighborhood was losing its integrated character due to discriminatory housing practices.

To the same effect, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982) (emphasis added to the statutory language in original) teaches that Congress intended to create in all "persons" a right to truthful information about housing availability and that it was for that reason that Section 3604(d) makes it unlawful:

> [t]o represent to *any person* because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.[8]

*Havens Realty, id.* at 373–74, 102 S.Ct. at 1121–22 therefore held that any person

---

7. See, e.g., *South–Suburban Housing Center v. Greater South Suburban Board of Realtors*, 935 F.2d 868, 878–79 (7th Cir.1991); *Gorski v. Troy*, 929 F.2d 1183, 1187–90 (7th Cir.1991); *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1525–27 (7th Cir.1990).

8. [Footnote by this Court] That language has currently been modified to read:

> [t]o represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

who is given untruthful information about housing availability for race-related reasons has suffered precisely the type of injury against which the statute is meant to protect, so that the person has standing to sue. In terms of this case, Sheila was unquestionably given untruthful information about the availability of the apartment—and if George did that because of Joseph's race, Sheila's right under Section 3604(d) has been violated and she has independent standing to sue irrespective of whether Joseph was a prospective tenant.[9]

Section 1982 also applies when whites are discriminated against because of their association with blacks. *Woods–Drake v. Lundy*, 667 F.2d 1198, 1201–02 (5th Cir. 1982) ruled that both Sections 1982 and 3604 applied when white tenants were threatened with eviction for having black dinner guests. Even closer to the mark, *Bills v. Hodges*, 628 F.2d 844, 845 (4th Cir.1980) decided that two white women who were evicted because they dated and entertained black men in their apartment could sue under Section 1982.[10] Surely if discrimination on the basis of a dating or dinner guest relationship confers standing, the same result follows a fortiori from the more substantial relationship of an engagement to be married.

9. *Havens Realty*, 455 U.S. at 379, 102 S.Ct. at 1124 also confirms Council's standing. It holds that a fair housing agency can establish injury in fact if it alleges that defendants' practices have drained its resources and thereby impaired its ability to provide counseling and referral services. *Dwivedi*, 895 F.2d at 1526 also says that a fair housing agency need only show "deflection of the agency's time and money from counseling to legal efforts directed against discrimination" to establish standing.

10. See also *Pomeroy v. Merritt Plaza Nursing Home, Inc.*, 760 F.2d 654, 657 (5th Cir.1985) (per curiam), which granted standing to sue under Section 1982 to a white woman who alleged that she was evicted because she had a black male friend.

11. Although Sheila intended to move into the apartment alone at the outset, Joseph intended to move in after their marriage (and, as already discussed, was a potential tenant on July 5).

12. G. Jilek Dep. 37 says:
Q: When did you first become aware that Mr. Cato was black?

### Section 3604 Liability

Plaintiffs alleging disparate treatment under Title VIII are generally required to establish a prima facie case of discrimination by showing that (1) they belong to a minority group, (2) defendants were aware of that, (3) plaintiffs were willing and able to rent defendants' apartment and (4) defendants refused to deal with plaintiffs (*Hamilton v. Svatik*, 779 F.2d 383, 387 (7th Cir.1985); cf. *Phillips v. Hunter Trails Community Ass'n*, 685 F.2d 184, 190 (7th Cir.1982)). That fits this case precisely under the facts set out in Jileks' own D. 12(m):

1. Joseph is a member of a minority group, and Sheila was his fiancee (and is now his wife).[11]

2. Jileks were aware that Joseph was black.[12]

3. Catos expressed their desire to rent the apartment.[13]

4. George told Sheila that the apartment was unavailable under one cover story or another, while in fact it remained on the market and was available to testers who viewed it five days later.

But Catos have gone far beyond that prima facie case by offering direct evidence of Jileks' discriminatory motives.[14] For ex-

A: When I looked at him.

13. Because Jileks rejected Catos as tenants before receiving their application, Catos' ability to rent the apartment was not completely clear at the time the claimed discrimination took place. Sheila did offer to place a full security deposit on the apartment (Smith Dep. 44), and the very fact that Catos have been living in the apartment since September 1990 confirms their financial ability to rent it. Understandably Jileks have not raised lack of ability as a defense, nor have they submitted evidence countering Catos' assertion that they were able to rent the apartment (Amended Complaint ¶ 8). That will therefore be considered an undisputed fact.

14. In the Title VII employment discrimination context, *Terbovitz v. Fiscal Court of Adair County*, 825 F.2d 111, 115 (6th Cir.1987) (citation omitted) has held that the prima facie case analysis is not necessary when plaintiffs offer, and the finder of fact believes, direct evidence of discriminatory intent:

"Direct evidence and the *McDonnell Douglas* [*Corp v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36

ample, George admitted in response to plaintiffs' interrogatories (G. Jilek Int. 13):

> The reason why Sheila Smith and Joseph Cato were not accepted, was because Carl Reinhart,[15] the tenant in 1–South told me, if Plaintiffs became tenants in the building: "George, if you rent the apartment to the two people you just showed the apartment to you will have a lot of trouble around here." I was afraid of my tenants and what they would do to my new building or to the Plaintiffs so I offered the apartment to Mr. and Mrs. Williams.

And G. Jilek Dep. 53–55 confirms that he understood Heinrich's comments to be racially motivated and that the comments led directly to George's rejection of Catos:

> A. Because I was inflamed by Carl Reinhart [sic]. After Sheila and Joe Cato is his name, when they left the apartment, they left after I showed it to them, okay.
>
> Then Carl came out and said, "George, I want to tell you something. You rent this apartment to these two people and you are looking for a lot of trouble in this neighborhood."
>
> I says, "Is that so, Carl?"
>
> He said, "I am right, George."
>
> I says, "Well, whatever you say, Carl."
>
> Well, that inflamed me, okay, that inflamed me.
>
> Q. When you say "inflamed me," what do you mean?

> A. It inflamed me because I thought of what could happen then perhaps.
>
> Q. What did—
>
> A. I was thinking broken windows. Maybe the tenants don't like him, a lot of civil disobedience perhaps on the property there.
>
> I don't know, thinking about property damage to my apartment building. Those are the things I thought of, okay.
>
> Then I called Sheila the next day; says, "Sheila, I have rented the apartment already so you just may as well forget this whole thing." ...

> \* \* \* \* \* \*

> Q. Is that what you understood to be the case? It was because Mr. Cato—
>
> A. I assume it was because the man is black. That's what I assumed.[16]

In the same vein, George also stated (G. Jilek Dep. 63):

> Q. Now, you did decide not to rent to Sheila and Joe because Joe was black; right?
>
> A. After I was inflamed by Carl. I was ready to rent to them because I have a tenant there now that's a minority. Robert Ahrweiler, his new wife is Japanese. I have no trouble with these people at all. I rented it right out to them.
>
> I would have rented it to Joe and Sheila too, but Carl inflamed me about the trouble there is going to be.

---

L.Ed.2d 668 (1973) ] [prima facie case] formulation are simply different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent." Direct evidence of discrimination, if credited by the fact finder, removes the case from *McDonnell Douglas* because the plaintiff no longer needs the inference of discrimination that arises from the prima facie case. Upon crediting the plaintiff's direct evidence, the district court finds facts requiring the conclusion that unlawful discrimination was at least a "motivating factor" for the employer's actions.... The existence of unlawful discrimination is patent, and if the employer does not propose an alternative explanation for its actions, Title VII liability will automatically follow.

**15.** [Footnote by this Court] George's reference to Carl Reinhart presumably means Karl Hein-

rich ("Heinrich"), who was the tenant in 1–South (Heinrich Dep. 11; P.Ex. 4). It is quite understandable for Heinrich's advice to have been influential with George, for Heinrich was the former owner of the 1461 Balmoral property (G. Jilek Dep. 16, 39; Heinrich Dep. 10). Interestingly, Heinrich denies having had the quoted conversation with George (Heinrich Dep. 11)—but that does not affect the result here.

**16.** [Footnote by this Court] Fear of "trouble in the neighborhood" or the reaction of other tenants does not, of course, excuse the racially motivated rejection of tenants (see, e.g., *Tolliver v. Amici*, 800 F.2d 149, 150–51 (7th Cir.1986); *Stewart v. Furton*, 774 F.2d 706, 707 (6th Cir. 1985); *Oliver v. Shelly*, 538 F.Supp. 600, 602 (S.D.Tex.1982)).

Q. Right. And your understanding that trouble was because Joe was black; right?

A. I would have to assume that's what it was.

And later (G. Jilek Dep. 69):

Q. Now, after Mr. Reinhart [sic] told you that if you rented to Sheila and Joe there would be problems, did you believe there would be problems?

A. Yes, I did.

\* \* \* \* \* \*

Q. Why did you think there would be problems?

A. Because I have seen this before in different areas, okay.

George disclosed his own attitude (without Heinrich as a cover story) in his interactions with Kuhnen and Tivin. Before making an appointment to show them the apartment, George specifically asked Kuhnen if they were white and upon learning that they were said, "Well, that's fine" (G. Jilek Dep. 46–47).[17] Then while Kuhnen and Tivin were viewing the apartment, George told them, "I would like to kill her [Sheila] for bringing a black man to my property" (id. at 52).[18]

Beverly too realized that her husband was rejecting Catos because Joseph was black, and she deferred to her husband's judgment in that respect (B. Jilek Dep. 59):

Q. So he did say to you that there might be a problem with the tenants because Mr. Cato is black; correct?

A. Correct.

Q. And that conversation took place in July of 1990; correct?

A. Yes.

Q. That was at the time that you were deciding to rent to the second couple; is that correct?

A. Correct.

Q. And you deferred to his judgment on the question of who to rent to; is that correct?

A. Yes. Correct.

That effectively summarized Beverly's testimony at the preceding pages (id. at 56–58).

■ In light of that direct evidence out of Jileks' own mouths, there is no need to rely on a prima facie case approach. That being true, the second step in the Section 3604 analysis parallels the analysis in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (see this Court's parsing of that analysis in *Phaup v. Pepsi-Cola General Bottlers, Inc.*, 761 F.Supp. 555, 562–63 & n. 18 (N.D.Ill.1991), like *Price Waterhouse* a Title VII case).[19] *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. at 1795 teaches:

[W]hen a plaintiff in a Title VII case proves that her gender played a motivating part in an employment decision, the

---

**17.** Kuhnen says that when he called George to set up the appointment to view the apartment, "George Jilek then inquired if [Kuhnen] was white stating 'I hate asking that question, but there have been lots of blacks coming by to see the apartment.'" (Kuhnen Aff. ¶ 6).

**18.** Kuhnen relates that conversation in these terms (Kuhnen Aff. ¶ 13):

George Jilek told affiant that the other day a white woman came to apply for the apartment. George Jilek said that he "could have killed her" because she was marrying a black man. George Jilek then said that he objected to blacks living in his building because the neighbors would not like it. He also said if one moves in they all start moving in and there aren't any of "them" in the area. He further stated that he told the white woman that the current tenant was not going to move.

Tivin Aff. ¶ 12 recounts a similar version.

**19.** Although *Price Waterhouse* deals with Title VII employment discrimination, our Court of Appeals has extended its approach to Title VIII in *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1263 (7th Cir.1990)—not a startling extension, given the general tendency of the courts to apply Title VII jurisprudence in Title VIII cases (see Robert Schwemm, *Housing Discrimination: Law and Litigation* §§ 10.1, 10.3 (1990)). Even as this opinion is being written, Congress has acted to change the impact of *Price Waterhouse* legislatively. But because the legislation would amend only Title VII in that respect (and not Title VIII), and because *Bachman* cites to the Supreme Court's analysis of the original statute in *Price Waterhouse* (a legal analysis that is presumably untouched by later legislative changes), this opinion indulges the pro-Jilek inference—this time legal, not factual—that the undiluted *Price Waterhouse* standard continues to control in Title VIII "mixed-motive" cases.

defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account.

*Bachman*, 902 F.2d at 1262–63 (citations omitted) explicates the same standard for Title VIII purposes:

To be actionable, racial prejudice must be a but-for cause, or in other words a necessary condition, of the refusal to transact. Otherwise there is no harm from the prejudice—the harm would have occurred anyway—and without harm there is no tort, constitutional, statutory, or common law.

Hence if there is a genuine issue of material fact as to whether Jileks would have rejected Catos even *without* taking race into account, plaintiffs' motion must be denied.

Jileks attempt to discount racial discrimination by contending that they actually rejected Catos because the couple was unmarried (D.Mem. 7–9). Jileks offer a few wisps in support of that proposition:

1. George said at one point during his deposition (G. Jilek Dep. 40):

How do I know the truth if she is getting married or not. People say they are getting married, they are not getting married. Who knows, okay. I don't know. Well, because it's really none of my business whether they are married or not; but I have a right who I want in my apartment building.

2. George asked both Sheila and Kuhnen about their marital status when they inquired about the apartment (Smith Dep. 37; Kuhnen Aff. ¶ 6; G. Jilek Dep. 47).

3. Beverly testified that she disapproved of unmarried people living together (B. Jilek Dep. 49) and that she preferred married to unmarried couples as tenants (*id.* at 34, 36, 38–39).

4. Beverly answered "[y]es" when asked (*id.* at 63):

Q. You mentioned earlier in your testimony that your husband mentioned two reasons ...

One, because Mr. Cato was black and there might be problems with the other tenants because he is black. And the other reason because the first couple said they were married.

Weren't those the two reasons that your husband discussed with you? [20]

Even when viewed in the light most favorable to Jileks, such scant evidence does not give rise to a reasonable inference that Catos' marital status by itself would have led Jileks to reject Catos. *Bank Leumi* (see n. 3) and like cases negate any requirement to draw overly strained (as contrasted with reasonable) inferences in the summary judgment framework. For that purpose "[t]he mere existence of a scintilla of evidence in support of [a party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]" (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). Jileks' evidence is really not even such a "scintilla"—it surely does not give rise to a reasonable inference that marital status influenced their decision.

Perhaps most importantly in that respect, Jileks (and even more distressingly, their lawyer) paint a blatantly false picture when they seek to portray George's decision as a choice between renting the apartment to (1) a white woman applicant who would be living in the apartment either alone or with a boy friend—who by chance happened to be black—until the couple did or did not decide to get married and (2) a white married couple. Only that fictional scenario enables Jileks to make the specious argument that they were indulging their preferences for married tenants over either single tenants or unmarried twosomes—neither of which preferences would run afoul of the statutory prohibitions against race-based discrimination.

---

20. [Footnote by this Court] Plaintiffs' lawyer, and not Jileks', asked that question (which may account for its leading nature). It may be that counsel was not fully sensitized to the nuances of the required causal nexus under *Price Waterhouse*, which can render a "mixed motives" case a less likely candidate for summary judgment.

But what gives the lie to that portrayal (indeed, what strips it of the protective mantle of good faith) is that George's turndown of Sheila and Joseph came *before* the other couple (who were unknown to George to be testers) ever appeared on the scene. George lied to Sheila, on the very next day after she had viewed the apartment on July 5, that it had become unavailable either because the previous tenant had decided not to leave or because George had actually rented the apartment to someone else (it doesn't matter whose recollection of that telephone conversation is accepted—either way, George flat out lied). It will be remembered that on that preceding day George had found Sheila's proposed immediate tenancy, and Joseph's prospective move-in after their September 12 marriage, totally acceptable—he had offered Sheila the application form to fill out and submit.

Only one factor changed between that total acceptability and the very next day's unacceptability of Sheila and Joseph (which was masked by George's lie about the apartment's purported unavailability): George's having become alerted to potential anti-black attitudes among other tenants, a problem that he did not want to face. And so the *only* possible inference, either reasonable or otherwise, is that George's July 6 rejection of Sheila and Joseph—which George repeated on July 9, once again *before* the white "married" couple showed up—was race-motivated and hence unlawful.

Thus Jileks' attempted injection of the marital status of the "Williamses" as a reason for finding them and not Catos acceptable tenants is a red (white?) herring. In probative terms, the only critical significance of the "Williamses'" July 10 entry into the drama was *not* to demonstrate that George's decision had been race-based (something that was definitively established as of four days earlier by George's own admissions), but rather to establish that George had lied to Sheila when he said the apartment was off the market, using one false story or another as a euphemism for George's race-triggered flip-flop as to Sheila's and Joseph's acceptability as tenants. Jileks' specious house of cards—so painstakingly and lovingly constructed by their counsel—crashes because its base is wholly nonexistent.

Indeed, even on their own impermissible terms Jileks could not avert a summary judgment loss here. Even if the critical timing of George's rejection of Sheila *before* the tester couple ever showed up as prospective "tenants" were to be ignored (as it cannot be), the now-claimed comparison between Catos and the "Williamses" in terms of their marital status would not generate a genuine issue of material (that is, outcome-determinative) fact.

First, it has already been established through Jileks' admissions that George and not Beverly made decisions about tenants—and here too she expressly deferred to his judgment as to Catos (B. Jilek Dep. 56, 59). Thus Beverly's statement regarding her own claimed preference for married tenants is irrelevant to the treatment that was accorded to Catos. Moreover, even that statement was attenuated by her testimony that she was not biased against unmarried people and did not object to unmarried couples living in her building (*id.* at 39–40).

George himself has at no point said that marital status influenced his decision. His one oblique reference to such status does not even rise to "scintilla" proportions in comparison with his numerous express admissions that Joseph's race led him to reject Catos. In fact, George admitted that "but for" Joseph's race he would have rented to Catos when he said, "I was ready to rent to them [Joseph and Sheila] ... but Carl inflamed me about the trouble there is going to be" (G. Jilek Dep. 63). Beverly's one statement that George "mentioned" marital status as well as race does not, given George's own admissions, raise a genuine issue of material fact about his reasons.

Finally, even those scant mentions of marital status came up only during Jileks' depositions. In his written response to plaintiffs' months-earlier written interrogatories as to Jileks' motivations, George did not refer to marital status at all. Instead

he identified only one, speaking in singular terms: Joseph's race was *"[t]he* reason why Sheila Smith and Joseph Cato were not accepted" (G. Jilek Int. 13).

When it comes to the issue of intent (and of establishing admissions on that score), that interrogatory response is plainly more reliable and compelling than Jileks' later depositions for more than one reason. First, unlike depositions, written responses to interrogatories are prepared statements. Jileks had the opportunity to consult with their attorney and consider their responses carefully before submitting them. In addition, Jileks' interrogatory responses were filed on September 21, 1990—just 2½ months after George had actually rejected Catos' tenancy. George's and Beverly's depositions, on the other hand, were not taken until January 17 and March 27 of this year. Thus no mention of marital status was made in this litigation—despite the express earlier opportunity to identify *every* motivation—until six months after Jileks had made their decision to reject Catos. Hence the only reasonable inference is that marital status was not in George's mind at the time that he did so, but was an afterthought advanced only under the prompting of this litigation.

Once again, though, it is important not to get caught in the deceptive snare that Jileks and their counsel have fashioned with the bogus marital status issue. That argument cannot begin to explain George's actions at the critical time that he rejected Catos' tenancy—with no married couple even on the horizon as prospective tenants—by lying about the apartment's availability, something explainable *only* in race-based terms.

### Section 1982 Liability

■ What has been said to this point also establishes Jileks' liability under Section 1982, even though that statute unlike Section 3604 requires proof of discriminatory intent (*Hamilton*, 779 F.2d at 387; *Phillips*, 685 F.2d at 187). George's admissions that he rejected Catos because of Joseph's race, and Beverly's deferral to her husband's race-based decision,[21] equally establish that Jileks acted with the prohibited intent, again even viewing the facts in the light most favorable to Jileks.

### Conclusion

Sheila and Joseph Cato have standing to sue under Sections 3604 and 1982 as a matter of both fact and law. In addition, there is no genuine issue of material fact as to Jileks' liability under both Sections, and Catos are entitled to a judgment as to liability as a matter of law under Rule 56(c). Jileks' motion for summary judgment is of course denied.

It was explained earlier that plaintiffs' cross-motion for summary judgment came only in response to this Court's inquiry after Jileks' motion had been fully briefed. Neither party tendered any further submissions, so that neither side has had the opportunity to address the issue of the appropriate remedy. This action is set for a status hearing at 10 a.m. November 25,

---

**21.** Although Beverly did not herself engage in overtly discriminatory conduct but merely deferred to George's decisions, she is nonetheless liable. Because they owned the 1461 Balmoral property as joint tenants (B. Jilek Dep. 12), George acted as Beverly's agent in renting the apartment. As *Coates v. Bechtel*, 811 F.2d 1045, 1051 (7th Cir.1987) (citations omitted) has explained:

> As a matter of well-settled agency law, a principal may be held liable for the discriminatory acts of his agent if such acts are within the scope of the agent's apparent authority, even if the principal neither authorized nor ratified the acts. In cases of racial discrimination in housing under both 42 U.S.C. § 1982 and 42

U.S.C. § 3604, the courts have imputed the wrongful acts of a real estate sales or rental agent to the property owner he is representing regardless of whether the owner specifically authorized the agent to engage in racial discrimination. The principal owner's liability is unaffected by the fact that the person committing the discriminatory acts in the course of disposing of the property is a relative or a neighbor rather than a professional real estate agent.

Consequently both spouses are liable when one spouse engages in discriminatory conduct while renting jointly owned property (*Izard v. Arndt*, 483 F.Supp. 261, 263 (E.D.Wis.1980)).

1991 to discuss further proceedings in that respect.